UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HAFEEZ SAHEED,

                              Plaintiff,

                -v.-

CITY OF NEW YORK, KEVIN KENNY,
WILLIAM NAKELSKI, OU WU, and
JOHN AND JANE DOE 1-10,

                              Defendants.

17 Civ. 1813 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Hafeez Saheed, proceeding *pro se*,[1] brings federal and state

claims against certain New York City Police Department ("NYPD") personnel —

Officers William Nakelski and Ou Wu, along with Lieutenant Kevin Kenny (the

"Officers") — and the City of New York (together with the Officers,

"Defendants"), stemming from an incident that occurred on December 12,

2015, when Saheed was pulled over in his vehicle, arrested, and issued several

summonses.  Presently before the Court is Defendants' motion for summary

judgment as to all of Saheed's claims.  For the reasons that follow, the Court

concludes that Plaintiff has established a genuine dispute of material fact with

---

[1]     Saheed was represented by counsel at the time of the filing of the initial Complaint and
        the First Amended Complaint.  In August 2018, Saheed requested that he be permitted
        to proceed *pro se*, claiming a breakdown of communications with his counsel.  (Dkt.
        #31).  The Court permitted counsel to withdraw by endorsement dated September 25,
        2018.  (Dkt. #33).  Then, on January 29, 2019, *pro bono* counsel entered a notice of
        appearance on the record for Saheed for the limited purpose of providing deposition
        assistance.  (Dkt. #38, 39).  Accordingly, Saheed was also represented during his own
        deposition, and during the depositions of the Officers in this case.  (*See* Dkt. #57-16–
        57-19).

respect to his federal constitutional claim for excessive force, and his related state-law claims for assault and battery, against Defendant Nakelski, and with respect to his federal claim for failure to intervene against Defendants Wu and Kenny. Saheed has failed to establish a genuine dispute of material fact as to the remainder his claims. Accordingly, Defendants' motion for summary judgment is granted in part and denied in part.

## BACKGROUND[2]

### A.    Factual Background

In the early morning hours of December 12, 2015, the Officers set up a vehicle safety checkpoint at the corner of Boston Road and Wilson Avenue in the Bronx, New York. (Ex. R ("Nakelski Dep.") 65:7-10, 65:21-66:3, 71:2-3; Ex. S ("Wu Dep.") 84:2-5; Ex. Q ("Kenny Dep.") 28:15-17).[3] The Officers used two marked police cars to signal the checkpoint and positioned themselves such that cars attempting to drive through would have to stop before being

---

[2]     The facts stated herein are drawn from Defendants' Rule 56.1 Statement of Undisputed Facts ("Def. 56.1" (Dkt. #72)); the exhibits attached to the Declaration of Melissa Wachs in Support of Defendants Motion for Summary Judgment (cited using the convention "Ex. [ ]" (Dkt. #57)); and the depositions of the parties to this case (cited using the convention "[Name] Dep." Citations to Defendants' Rule 56.1 Statement incorporate by reference the documents and deposition testimony cited therein. *See* Local Rule 56.1(d).

For ease of reference, Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment will be referred to as "Def. Br." (Dkt. #58); Plaintiff's Response to Summary Judgment and Defendants' Statement as "Pl. Opp." (Dkt. #65); and Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment as "Def. Reply" (Dkt. #73).

[3]     Only limited excerpts of the depositions of Saheed, Kenny, Nakelski, and Wu were filed on the public docket in this case, as Exhibits P, Q, R, and S, respectively. The Court requested and received the full version of these transcripts from defense counsel. When the Court refers to these Exhibits, it is referring to the full version of the deposition transcripts. In order for the public record to be complete, the Court will order defense counsel to file the full deposition transcripts on the public docket.

able to pass.  (Kenny Dep. 34:5-13, 37:3-11; Wu Dep. 41:17-48:2, 96:9-12; Nakelski Dep. 71:23-72:4).  Individuals who were stopped at the checkpoint were required to produce a valid driver's license.  (Nakelski Dep. 80:13-20; Kenny Dep. 37:15-22).

At approximately 3:50 a.m. on December 12, 2015, Saheed was driving home from a social gathering when he was stopped by the Officers at the checkpoint.  (Ex. P ("Saheed Dep.") 82:9-91:16; Kenny Dep. 59:23-25, 62:8-23; Wu Dep. 103:13-18).  Kenny approached the passenger-side window of Saheed's car and asked Saheed for his license, registration, and insurance. (Saheed Dep. 91:19-92:13; Kenny Dep. 63:6-8, 66:6-12).  Nakelski and Wu approached the driver-side window of Saheed's car.  (Nakelski Dep. 85:19-86:6, 86:24-87:2; Wu Dep. 103:19-23; Saheed Dep. 99:14-23).  In response, Saheed was unable to produce a driver's license.  (Kenny Dep. 66:13-16; Saheed Dep. 94:3-13; Nakelski Dep. 88:5-20; Wu Dep. 110:19-111:7).  Kenny testified at his deposition that when he asked Saheed for his license, Saheed stated repeatedly, "[w]hy do I have to give you my license?"  (Kenny Dep. 107:8-15, 108:8-16, 115:8-14).

While Saheed's car was stopped at the checkpoint, the Officers observed that Saheed's car windows were tinted, perhaps excessively so.  (Nakelski Dep. 86:10-14, 141:4-6).  Wu used a tint meter on Saheed's car windows and found that the driver's side and passenger's side windows were tinted 45% (i.e., a tint that allows for 45% of outside light to pass through), which Wu

recognized to be below the legal threshold in New York of 70%. (Wu Dep. 105:12-106:10, 106:20-22, 155:16-19; Ex. F).

Saheed was then ordered out of the car. (Wu Dep. 107:19-20; Nakelski Dep. 89:22-90:11). How he exited is a point of dispute among the parties. Saheed testified that Nakelski, who was standing next to Saheed on the driver's side of the car, pulled Saheed's forearm to remove him from the car. (Saheed Dep. 103:11-14, 104:7-105:6).[4] Nakelski and Wu both testified that Saheed freely got out of the car on his own, without anyone touching him. (Nakelski Dep. 90:4-91:2; Wu Dep. 107:25-108:3, 136:24-137:7, 140:16-17). Nakelski then handcuffed Saheed and walked him to the trunk of his car. (Wu Dep. 112:12-22; Nakelski Dep. 91:3-13; Saheed Dep. 106:10-24). Nakelski used two sets of handcuffs (with the cuff of one joined to the cuff of the other) because of Saheed's size, in order to make Saheed more comfortable. (Nakelski Dep. 123:12-17; *see also* Saheed Dep. 105:15-106:9).

When Saheed was at the back of the car, sitting on the trunk, the Officers asked Saheed again if he had a license, and Saheed responded in the negative. (Wu Dep. 112:20-113:14; Nakelski Dep. 91:6-13). Nakelski then went to his police car to run a records search in the NYPD database to try to identify Saheed. (Nakelski Dep. 92:24-93:10, 96:4-9; Saheed Dep. 110:6-8, 110:15-111:13). Nakelski tried to verify Saheed's identity but was unable to do

---

[4]     Saheed also testified that, at some prior time during the stop, Kenny pulled at the right side of Saheed's body, from a position partially inside the passenger side of Saheed's car. (Saheed Dep. 98:22-99:11, 100:25-101:19, 102:5-15). The Court understands Saheed to be alleging injury only due to the handcuffing, which is the only injury for which there is substantiation in the record before the Court.

so with the information he had.  (Kenny Dep. 72:12-16, 73:20-74:8, 80:19-22, 103:14-17).  Saheed testified that around this time, he told Kenny that he needed an ambulance; none was called.  (Saheed Dep. 114:3-23).

The Officers were unable to determine if Saheed had a valid driver's license.[5]  Because the Officers could neither confirm Saheed's identity nor verify that he was licensed, Nakelski brought Saheed back the 47th Precinct in his marked police vehicle.  (Nakelski Dep. 105:20-23, 118:16-24, 120:18-25, 124:4-6; Kenny Dep. 109:11-13; Wu Dep. 128:3-14; Saheed Dep. 96:7-97:7, 114:24-115:1).  After the Officers conducted an inventory search of Saheed's car, Wu drove it back to the Precinct.  (Kenny Dep. 69:4-5; Saheed Dep. 116:18-19).  Kenny did not return to the Precinct with Nakelski and Wu. (Kenny Dep. 130:14-131:18).

Back at the Precinct, Nakelski searched Saheed.  (Nakelski Dep. 152:4-9; Saheed Dep. 117:6-9).  During the search, Nakelski discovered an altered New York State driver's license in Saheed's wallet.  (Nakelski Dep. 152:4-15; Wu Dep. 147:2-4; Ex. I; *see* Saheed Dep. 123:20-124:3).  The license had black marker across the expiration date.  (Nakelski Dep. 152:10-15; *see* Ex. I).  Wu vouchered the license.  (Wu Dep. 146:3-7; Ex. H).  Wu then put Saheed into the Precinct's holding cell, where he remained for about an hour.  (Nakelski

---

[5]    In fact, the record reflects that Saheed did have a Delaware temporary license authorizing him to drive from December 7, 2015, to February 7, 2016.  (Wu Dep. 173:23-174:9; Nakelski Dep. 202:24-205:25; Kenny Dep. 148:13-150:10).  However, it is undisputed that Saheed did not present this temporary license to the Officers at the time of his arrest, nor did he tell the Officers that he had such a temporary license.  (Wu Dep. 110:25-111:3; Nakelski Dep. 127:2-4, 205:18-22).

Dep. 180:6-10; Wu Dep. 118:23-119:2). When Saheed was put in the cell, his handcuffs were removed. (Saheed Dep. 119:14-18). However, according to Saheed, his right wrist was still numb and irritated from the handcuffs. (*Id.* at 119:21-120:1). While he was in the cell, Saheed requested a bathroom break, which was provided to him, and medical attention, which was not. (*Id.* at 120:2-22).[6]

Wu then issued Saheed four summonses. (Wu Dep. 147:25-148:11). Three of the summonses were traffic court summonses: one for being an unlicensed operator (Ex. C), and two for excessive window tints (Ex. D, E). The final summons was a criminal court summons for having an altered driver's license. (Ex. F). After Wu issued Saheed the summonses, Saheed was released from the Precinct with his car keys. (Wu Dep. 161:23-162:5).

As he was exiting the Precinct, Saheed called 911 from his cellphone and requested an ambulance. (Saheed Dep. 126:20-21, 128:5-8). Saheed then went into his car, charged his phone, and left the Precinct. (*Id.* at 128:1-16). Saheed subsequently called 911 back and asked them to meet him at 221st

---

[6] All three Officers testified that Saheed never asked for medical attention or treatment. (Kenny Dep. 118:25-119:10; Nakelski Dep. 138:24-139:7, 151:5-10; Wu Dep. 132:18-20, 133:8-14). Nor did any of the Officers observe Saheed with any injuries, or in need of any medical attention. (Kenny Dep. 119:7-21; Nakelski Dep. 176:9-22). Officer Nakelski also testified that, upon arriving at the 47th Precinct with Saheed, he took Saheed to the Desk Sergeant to fill out a pedigree card. (Nakelski Dep. 145:7-20). The pedigree card asks whether the arrestee has any injuries or needs medical attention. (*Id.* at 149:4-9). Nakelski answered both questions in the negative after being advised by Saheed that he did not need medical attention and had no injuries. (*Id.* at 149:14-19). Nakelski testified that the Desk Sergeant on duty at the time would have heard Nakelski ask, and Saheed answer, the questions posed on the pedigree card, and the Desk Sergeant would have separately confirmed the answers with the arrestee. (*Id.* at 150:17-151:4).

6

Street, near his home, rather than the Precinct. (*Id.* at 128:17-19). He drove to 221st Street, parked his car, and waited for the ambulance to arrive. (*Id.* at 128:20-23). When the ambulance arrived, Saheed showed the EMS workers his swollen hand. (*Id.* at 128:24-129:2). They gave him a bandage and wrapped it for him. (*Id.*). They also told him his blood pressure was high and gave him oxygen. (*Id.* at 129:10-18).

As Saheed was sitting in the back of the ambulance, giving the EMS workers his information, he noticed Kenny nearby. (Saheed Dep. 129:19-131:11, 134:16-135:5). Kenny had arrived on the scene because Saheed had either requested an NYPD supervisor from the EMS workers or called 911 again to request a supervisor at the scene. (*Id.* at 134:16-22). Kenny himself recalled responding to a radio request from a dispatcher reporting an incident of a past assault. (Kenny Dep. 132:3-6). When Kenny received the call, he did not know that the incident involved Saheed. (*Id.* at 133:10-13). When Kenny arrived, he spoke with the EMS personnel, who explained that Saheed was complaining about pain to his wrist caused by his arresting officers. (*Id.* at 132:24-133:9). After speaking with EMS, Kenny called the NYPD Internal Affairs Bureau ("IAB") to report that a complainant had called 911 about force being used against him, which force the complainant claimed had resulted in an injury to his wrist. (*Id.* at 136:10-18). Kenny waited at the scene for IAB to call him back with a follow-up protocol. (*Id.* at 138:17-139:2).

Saheed told the EMS workers that he did not want to see or talk to Kenny. (Saheed Dep. 134:23-135:3). At that point, the ambulance was ready

to take Saheed to the hospital. (*Id.* at 135:6-9). Saheed asked the ambulance to wait so that a different NYPD supervisor could come to secure Saheed's property. (*Id.* at 135:9-16). The EMS workers told Saheed that they needed to leave to attend to another emergency. (*Id.* at 135:20-24). The ambulance then drove off a little bit, but Saheed asked the EMS workers to stop the ambulance so he could get out and secure his car. (*Id.* at 135:21-136:15). The ambulance report states as follows

> 32 YR OLD MALE FOUND WAITING BY STREET CORNER STATING HE WAS INJURED BY NYPD WHILE BEING REVIEWED DURING A CAR STOP PT HAS MINOR SWELLING TO LEFT FOREARM PT CO PAIN AND STARTED TALKING ON CELL PHONE DURING EVALUATION PULSE IS GOOD MOBILITY IMPAIRED AND DIMINISHED; AFTER PTS ARM IMMOBILIZED AND WHILE 10 82 PT DEMANDED WE STOP STATING H[E] HAD TO SECURE HIS CAR FIRST BECAUSE THE OFFICER PARKED BEHIND HIS CAR. PT SIGNED AND DEMANDED WE LET HIM OUT AND LEFT.

(Ex. J ("Ambulance Records") DEF204). Saheed got out of the ambulance, went into his car, and drove himself to Jacobi Medical Center ("Jacobi"). (Saheed Dep. 136:16-137:8).

When he got to Jacobi, Saheed was triaged by the nurses. (Saheed Dep. 137:9-15). The records from his emergency room visit state: "Pt reports right wrist pain s/p assaulted by police" and "Pt is in no distress, + pulses, able to wiggle fingers, no obvious swelling noted to site." (Ex. K ("Emergency Room Records") P6). The report also indicates that Saheed "refused to give any history and refused care," but that "[h]e was conversational and did not appear to be in distress." (*Id.* at P10). Saheed testified, and the Emergency Room

Records reflect, that Saheed left the emergency room before being evaluated by either a doctor or nurse. (*Id.* at P9; Saheed Dep. 137:9-138:5). At his deposition, Saheed explained that he left the emergency room and went home because the wait was too long. (Saheed Dep. 137:8-138:7).

The next time Saheed sought medical treatment for his right wrist was seventeen days after the incident. (*See* Ex. L (medical note dated December 29, 2015)). The only evidence substantiating Saheed's treatment are the notes from a "Wellness Visit" with Saheed's doctor, Dr. Howard Hochster. (*See id.*). The notes from that visit state: "During a pull-over by Police on 12/15/15, he injured medical aspect of right wrist. Has not yet had it evaluated medically. Went to JMC BP was > 200/120, but he left prior to evaluation." (*Id.*). The records also state "Abrasion of right wrist, initial encounter" and "Notes: check x-rays." (*Id.*).

Saheed testified that Dr. Hochster was very concerned about Saheed's injury and the continued pain in his hand, and referred Saheed to Montefiore Medical Center to get an x-ray. (Saheed Dep. 140:18-20). Saheed went and got the x-ray taken right away. (*Id.* at 140:21-141:4). The x-rays and the radiology report interpreting them are not in the record, but Saheed testified that after reviewing the x-ray, Dr. Hochster told him that his wrist was swollen and sprained and asked for the x-ray to be taken again. (*Id.* at 141:5-15). Saheed obtained a second x-ray, but could not recall its results. (*Id.* at 141:16-25). He testified that Dr. Hochster prescribed him 30 days of 800 mg ibuprofen, which

Saheed took only when he was in pain. (*Id.* at 142:1-13). Saheed did not seek any further medical treatment for his wrist injury. (*Id.* at 142:18-22).

Saheed appeared in criminal court once, on February 10, 2016, at which time the criminal summons was dismissed. (Ex. N; Def. 56.1 ¶ 9). Saheed proceeded to a hearing on his traffic court summonses on June 21, 2017, during which evidence was taken by an Administrative Law Judge ("ALJ"). (*See* Ex. M ("ALJ Hg. Tr.")). The ALJ dismissed the two summonses for tinted windows, but found Saheed guilty of being an unlicensed operator. (*Id.*).[7] Saheed appealed the ruling but was unsuccessful. (Def. 56.1 ¶ 11).

## B. Procedural History

On August 7, 2017, Saheed filed the complaint in this action. (*See generally* Dkt. #9 (the "Complaint" or "Compl.")). Saheed alleged federal constitutional claims under 42 U.S.C. § 1983 for false arrest and unlawful imprisonment; violation of his right to a fair trial; malicious prosecution; excessive force; and failure to intervene, arguing both supervisory liability and municipal liability. (*Id.* at ¶¶ 35-69). He also alleged state-law claims of false arrest; assault; battery; malicious prosecution; negligent screening, hiring, and retention; negligent training and supervision; negligence; and a violation of Article 1, Section 12 of the New York State Constitution. (*Id.* at ¶¶ 70-111). Saheed alleged that the above-described incidents occurred as a direct result of the unconstitutional policies, customs, or practices of the City of New York,

---

[7]  The ALJ dismissed the summonses for the window tints because Saheed's car was registered somewhere other than New York. (*See* ALJ Hg. Tr. 14:24-15:4).

including, *inter alia*, the inadequate screening, hiring, retaining, training, and supervising of its employees, and pursuant to a practice of escalating traffic stops to full-blown arrests without sufficient bases to do so. (*Id.* at ¶ 24). Specifically, he claimed that the City failed to train its police officers in how properly to de-escalate situations and not otherwise lose their tempers when civilians ask why they are being stopped or arrested. (*Id.*).

On July 12, 2018, the Court entered the parties' proposed case management plan and discovery schedule. (Dkt. #30). The parties then engaged in several months of discovery, which closed on July 2, 2019. (Dkt. #41).

The Court held a conference in this case on July 29, 2019, after the conclusion of fact discovery, at which time it set a briefing schedule for Defendants' motion for summary judgment. (Dkt. #51 (transcript)). Defendants filed their summary judgment motion on September 20, 2019. (Dkt. #54-59). Defendants provided the Court with the following pieces of evidence in support of their motion for summary judgment: the three traffic court summonses issued to Saheed on December 12, 2015 (Ex. C, D, E); a portion of Officer Wu's memo book, in which he recorded Saheed's window tints of 45% (Ex. F); the criminal court summons issued to Saheed on December 12, 2015 for an altered driver's license (Ex. G); the voucher created for Saheed's altered driver's license (Ex. H); a copy of Saheed's altered driver's license (Ex. I); a copy of Saheed's pre-hospital care report for December 12, 2015 (Ambulance Records); a copy of Saheed's emergency room record for

December 12, 2015 (Emergency Room Records); a copy of the medical record from Saheed's first doctor's appointment on December 29, 2015 (Ex. L); a copy of the transcript of the hearing conducted by the New York State Department of Motor Vehicles Administrative Adjudication Bureau, in which the ALJ found Saheed guilty on the traffic summons for being an unlicensed operator (ALJ Hg. Tr.); a copy of the disposition sheet from Saheed's criminal court summons (Ex. N); a copy of portions of Nakelski's memo book that indicate that Saheed's vehicle was stopped by Wu and that Saheed was unable to provide a driver's license (Ex. O); and copies of excerpts of the deposition transcripts of Saheed, Kenny, Nakelski, and Wu. As Saheed was *pro se* at this time, Defendants also served Saheed with the "Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment" as required by Local Civil Rule 56.1. (Dkt. #55, 59).

The Court granted Saheed an extension of time to submit his opposition papers (*see* Dkt. #63), and Saheed submitted his opposition on December 26, 2019 (Dkt. #65). Saheed's opposition submission consists of the following assertions: (i) Saheed was not pulled over; (ii) Saheed did not encounter police or law enforcement officers at 3:50 a.m.; (iii) Saheed was asked for his driver's license and stated that he had his registration and temporary paper license in his glove compartment; (iv) Saheed had some valid and some expired identification cards in his wallet; (v) when Saheed was arrested, the police stated he had an expired and defaced license in his wallet; (vi) Saheed questioned the police as to why it mattered whether he had an expired and defaced license; (vii) Saheed was issued four tickets (a criminal summons, two

summonses for window tints, and a summons for "no license operator");

(viii) all three of Saheed's tickets were dismissed except the one for being an

unlicensed operator; and (ix) the traffic court judge found Saheed guilty for not

having the temporary license provided to him by the Department of Motor

Vehicles ("DMV") in Delaware.  (*See generally* Pl. Opp.).

On January 27, 2020, Defendants filed a corrected Rule 56.1 statement

(Dkt. #72), and on January 29, 2020, they filed their reply brief (Dkt. #73).  On

March 26, 2020, in response to a request from the Court, Defendants provided

complete copies of the relevant deposition transcripts.

## DISCUSSION

**A.    Applicable Law**

### 1.    Motions for Summary Judgment Under Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant

summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[8]

A fact is "material" if it "might affect the outcome of the suit under the

governing law," and is genuinely in dispute "if the evidence is such that a

---

[8]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations and quotation marks omitted). The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

In deciding a motion for summary judgment, "a district court generally 'should not weigh evidence or assess the credibility of witnesses.'" *Rojas* v. *Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Hayes* v. *N.Y.C Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)). But to that general rule, the Second Circuit has recognized an exception:

> in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether

> there are any "genuine" issues of material fact, without
> making some assessment of the plaintiff's account.

*Jeffreys*, 426 F.3d at 554 (internal citation omitted) (quoting *Anderson*, 477
U.S. at 252). In this rare setting, a court considering a summary judgment
motion may make credibility determinations. *SEC* v. *Jankovic*, No. 15 Civ.
1248 (KPF), 2017 WL 1067788, at *8 (S.D.N.Y. Mar. 21, 2017). Even then, the
Second Circuit has cautioned that, "[i]f there is a plausible explanation for
discrepancies in a party's testimony, the court considering a summary
judgment motion should not disregard the later testimony because of an earlier
account that was ambiguous, confusing, or simply incomplete." *Jeffreys*, 426
F.3d at 555 n.2 (emphasis and citation omitted). Instead, such credibility
assessments are to be reserved for "extraordinary cases, where the facts alleged
are so contradictory that doubt is cast upon their plausibility." *Rojas*, 660 F.3d
at 106 (citation and quotation marks omitted).

### 2. Motions for Summary Judgment in *Pro Se* Cases

In a *pro se* case, the court must take an additional step and liberally
construe the *pro se* party's pleadings "to raise the strongest arguments that
they suggest." *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)
(quoting *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

This task has been complicated by Plaintiff's imperfect compliance with
Local Rule 56.1. Under that rule, a movant is required to identify admissible
evidence in support of each factual assertion in his or her Rule 56.1 statement.
*See* S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant ... pursuant to
Rule 56.1(a) ... must be followed by citation to evidence which would be

admissible, set forth as required by Fed. R. Civ. P. 56(c).").  Conversely, a

non-movant seeking to controvert these factual assertions must also cite to

admissible evidence, and where properly supported facts in a Local Rule 56.1

statement are denied with only conclusory assertions, the court will find such

facts to be true.  *See id.*; *id.* at 56.1(c) ("Each numbered paragraph in the

statement of material facts set forth in the statement required to be served by

the moving party will be deemed to be admitted for purposes of the motion

unless specifically controverted by a correspondingly numbered paragraph in

the statement required to be served by the opposing party.").

"*Pro se* litigants are … not excused from meeting the requirements of

Local Rule 56.1." *Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y.

2009) (citing *Vt. Teddy Bear*, 373 F.3d at 246).  Nevertheless, even where there

is incomplete compliance with the Local Rules, a court retains discretion "to

consider the substance of the plaintiff's arguments."  *Id.* (citing *Holtz* v.

*Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not

required to consider what the parties fail to point out in their Local Rule 56.1

Statements, it may in its discretion opt to conduct an assiduous review of the

record even where one of the parties has failed to file such a statement."

(internal quotation marks omitted))); *see also Hayes* v. *Cty. of Sullivan*, 853 F.

Supp. 2d 400, 406 n.1 (S.D.N.Y. 2012) ("In light of Plaintiff's *pro se* status, the

Court overlooks his failure to file a Local Rule 56.1 Statement and conducts its

own independent review of the record.").  To be fair to all parties, the Court will

rely principally on its own assiduous review of the record.

**B.** **The Court Grants in Part and Denies in Part Defendants' Motion for Summary Judgment**

At the outset, it is worth noting that the only evidence the Court has before it is that which has been provided by Defendants. Saheed's opposition submission consists only of assertions with no citations to any evidence adduced during discovery; indeed, some of Saheed's current assertions stand in stark contrast to the allegations in his Complaint, to his deposition testimony, and to his statements to the Court in pretrial conferences. Even construing Saheed's submission and the record in this case liberally, the Court finds a triable issue of fact only as to Saheed's force-based claims.

**1.** **The Court Grants Defendants' Motion for Summary Judgment as to Saheed's Claims for False Arrest and Malicious Prosecution**

**a.** **Applicable Law**

Under New York law, which governs Saheed's false arrest claim, a plaintiff must prove the following elements: (i) the defendants intended to confine him; (ii) the plaintiff was conscious of the confinement; (iii) the plaintiff did not consent to the confinement; and (iv) the confinement was not otherwise privileged. *Ackerson* v. *City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012); *Savino* v. *City of New York,* 331 F.3d 63, 75 (2d Cir. 2003). A claim for false arrest is equivalent to a claim for false imprisonment, with the same analysis applied to both claims. *See, e.g., Posr* v. *Doherty*, 944 F.2d 91, 96 (2d Cir. 1991) ("In New York, the tort of false arrest is synonymous with that of false imprisonment."). Further, a claim for false arrest under § 1983 is "substantially the same as a claim for false arrest under New York Law."

*Jenkins* v. *City of New York*, 478 F.3d 76, 84 (2d Cir. 2007). Significantly, probable cause — discussed further below — is a complete bar to a plaintiff's recovery of damages for a false arrest or false imprisonment claim. *Stansbury* v. *Wertman*, 721 F.3d 84, 89 (2d Cir. 2013); *Torraco* v. *Port Auth. of N.Y. and N.J.*, 615 F.3d 129, 139 (2d Cir. 2010); *Jaegly* v. *Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (citing *Devenpeck* v. *Alford*, 543 U.S. 146, 153 (2004)).

As to the related claim of malicious prosecution, the Second Circuit recently observed:

> To prevail on a § 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello* v. *City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (internal citations omitted). New York law requires a plaintiff to demonstrate that "[i] the defendant initiated a prosecution against plaintiff, [ii] without probable cause to believe the proceeding can succeed, [iii] the proceeding was begun with malice[,] and[ ] [iv] the matter terminated in plaintiff's favor." *Rentas* v. *Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (internal quotation marks omitted). Further, "[i]n order to allege a cause of action for malicious prosecution under § 1983, [the plaintiff] must assert, in addition to the elements of malicious prosecution under state law, that there was [v] a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman* v. *N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (emphasis omitted).

*Azeez* v. *City of New York*, 790 F. App'x 270, 273 (2d Cir. 2019) (summary order); *accord Harrison* v. *Cty. of Nassau*, No. 18-3349, — F. App'x —, 2020 WL 1189398, at *2 (2d Cir. Mar. 12, 2020) (summary order). With particular respect to the favorable termination element, it is not enough that the charges be dismissed: To state a claim for malicious prosecution under § 1983, a

plaintiff must "show that the underlying criminal proceeding ended in a manner that affirmatively indicates his innocence." *Lanning* v. *City of Glens Falls*, 908 F.3d 19, 22 (2d Cir. 2018).  As with false arrest claims, probable cause can be a complete defense to a claim of malicious prosecution.  *Savino*, 331 F.3d at 72; *Stansbury*, 721 F.3d at 94-95.

"[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Gonzales* v. *City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (emphasis omitted).  The standard is "fluid," and demands not "hard certainties," but rather facts sufficient to establish the sort of "fair probability" on which "reasonable and prudent men, not legal technicians, act." *Illinois* v. *Gates*, 462 U.S. 213, 231-32, 238 (1983).  When determining whether probable cause to arrest exists, a court "must consider those facts available to the officer at the time of the arrest and immediately before it." *Lowth* v. *Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996).  "A court examines each piece of evidence and considers its probative value, and then 'look[s] to the totality of the circumstances' to evaluate whether there was probable cause to arrest and prosecute[.]" *Stansbury*, 721 F.3d at 89 (quoting *Panetta* v. *Crowly*, 460 F.3d 388, 395 (2d Cir. 2006)).

"If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without

violating the Fourth Amendment, arrest the offender." *Atwater* v. *City of Lago Vista*, 532 U.S. 318, 354 (2001); *see also Virginia* v. *Moore*, 553 U.S. 164, 176 (2008) (holding an arrest lawful under the Fourth Amendment despite state law prohibiting arrest for the offense); *United States* v. *Scopo*, 19 F.3d 777, 781-82 (2d Cir. 1994) (finding probable cause to arrest where officers observed plaintiff failing to signal while changing lanes). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant* v. *Okst*, 101 F.3d 845, 852 (2d Cir. 1996).[9]

### b. Analysis

Since probable cause is a defense to Saheed's claims of false arrest and malicious prosecution, the Court has reviewed the record to determine whether, as a matter of law, there was probable cause to arrest him on

---

[9] "The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases," *Stansbury* v. *Wertman*, 721 F.3d 84, 95 (2d Cir. 2013), as in the malicious prosecution context, probable cause is established where there are "facts and circumstances as would lead a reasonably prudent person to believe the plaintiff [is] guilty," *Boyd* v. *City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). "The existence or nonexistence of probable cause.... is determined, at the earliest, as of the time the prosecution is commenced." *Rothstein* v. *Carriere*, 373 F.3d 275, 292 (2d Cir. 2004). Further, "even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause. In order for probable cause to dissipate, the groundless nature of the charge must be made apparent by the discovery of some intervening fact." *Kinzer* v. *Jackson*, 316 F.3d 139, 144 (2d Cir. 2003) (citation omitted). Finally, probable cause must be shown as to each criminal charge underlying the malicious prosecution claim. *Burton* v. *Undercover Officer*, 671 F. App'x 4, 5 (2d Cir. 2016) (summary order) (collecting cases).

The Court recognizes that "indictment by a grand jury creates a presumption of probable cause" that can be rebutted "only 'by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Manganiello* v. *City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010) (quoting *Savino* v. *City of New York,* 331 F.3d 63, 72 (2d Cir. 2003)). However, in this case, there was no indictment, but rather only a misdemeanor summons.

December 12, 2015.  The Court concludes in the affirmative.  To review,

Saheed was brought to the 47th Precinct in handcuffs after being pulled over

by the Officers at a vehicle checkpoint and failing to produce a valid driver's

license.  Driving on a public roadway without a license is a misdemeanor

offense under New York Vehicle and Traffic Law ("VTL") § 509.  Given that

Saheed was not able to produce a valid driver's license to the Officers, or

otherwise show that he had a valid license, they had probable cause to believe

that he was violating VTL § 509.  *See People* v. *Miller*, 539 N.Y.S.2d 809, 812

(2d Dep't 1989) ("Moreover, based on the defendant's failure to produce a

driver's license and his admission that he was operating the car, an arrest of

the defendant for driving without a license was also warranted" (citing VTL §

509)); *People* v. *Griffin*, 456 N.Y.S.2d 334, 339 (Sup. Ct. N.Y. Cty. 1982)

("Assuming, however, that the stop and demand for license and registration

was reasonable, the officers did have the right to take defendant and his car to

the precinct when he did not produce a license and registration and when he

was also unable to provide adequate identification.").  This probable cause is

enough to defeat Saheed's claim for false arrest.[10]

Turning to Saheed's malicious prosecution claim, the Court observes as

an initial matter that it applies, if at all, only to the criminal court summons

---

[10]     Of further note, Saheed is collaterally estopped from contending that he was not an
unlicensed operator.  On June 21, 2017, Saheed and Wu appeared to give testimony
and evidence before ALJ Gaithry Alli concerning the three traffic summonses that had
been issued to Saheed for his illegal window tints and for being an unlicensed operator.
(*See generally* ALJ Hg. Tr.).  The ALJ found Saheed guilty of being an unlicensed driver.

issued to Saheed (*see* Ex. G) for the misdemeanor offense of having an altered license. *See generally Burg* v. *Gosselin*, 591 F.3d 95 (2d Cir. 2010).[11]  As Defendants note, that charge was resolved in a single hearing held on February 10, 2016, at which time it was dismissed.  (*See* Ex. N).  Despite the lack of record evidence as to why that charge was dismissed, it is clear that the Officers had probable cause to issue the summons to Saheed for having an altered license.  A New York State license bearing Saheed's name and photo, with the expiration date and other portions crossed out in black ink, was discovered in Saheed's wallet during a search incident to a lawful arrest.  (*See*

---

(*Id*. at 14:24-15:10).  Following this finding, Saheed appealed the decision, but the verdict stood.  (Saheed Dep. 17:1-7).

The subject of the DMV hearing was whether the summonses, issued to Saheed by the Officers, were supported by probable cause.  Before the DMV, the issue was litigated and resolved against Saheed.  (*See* ALJ Hg. Tr. 14:24-15:4).  Accordingly, Saheed is collaterally estopped from re-litigating the probable cause for his arrest.  *See Gelb* v. *Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986) (The doctrine of collateral estoppel has four requirement for the bar to apply: (i) the issues in both proceedings must be identical; (ii) the issue in the prior proceeding must have been actually litigated and actually decided; (iii) there must have been a full and fair opportunity for the litigation in the prior proceeding; and (iv) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.).  Several courts have held that the principles of collateral estoppel apply to DMV hearings.  *See, e.g., Azeez* v. *City of New York*, No. 16 Civ. 342 (NGG) (SJB), 2018 WL 4017580, at *8-9 (E.D.N.Y. Aug. 22, 2018), *aff'd*, 790 F. App'x 270 (2d Cir. 2019) (summary order); *Regent* v. *Town of Cheektowaga*, No. 03 Civ. 347 (RJA), 2007 WL 981771, at *6-8 (W.D.N.Y. Mar. 30, 2007); *Janendo* v. *Town of New Paltz Police Dep't*, 621 N.Y.S.2d 175, 178 (3d Dep't 1995).

[11]  The Officers also had probable cause to issue the summonses for window tints.  Wu testified that he had been trained to visually assess tints by whether he could see into the vehicle, and that when he saw Saheed's vehicle he believed the tints to be too dark.  (Wu Dep. 69:7-11, 70:17-23, 105:12-106:2).  When Wu checked the tints on Saheed's front driver and passenger side doors with his tintometer, he found them to be at 45%, below the legal threshold of 70%.  (*Id*.at 106:3-6).  Wu recorded the tint percentage on each ticket and in his memo book.  (Ex. F).  Plaintiff was issued two tickets for illegal window tints — one for each window.  (Ex. D, E).  At his deposition, Saheed testified that his car had factory tints that he did not modify.  (Saheed Dep. 125:22-126:1).  However, the facts before Wu were "sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person arrested."  *Zellner* v. *Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007).  Saheed can offer no argument to the contrary.

Nakelski Dep. 152:4-15; Wu Dep. 147:2-4; Ex. H, I). Altering a license is a violation of VTL § 392, and is a misdemeanor offense. VTL § 392 does not have an intent requirement; a violation does not require that the individual intend to use the altered license, just that he or she possess it. *See People* v. *Strauss*, 22 N.Y.S.2d 880, 880 (2d Dep't 1940). Saheed acknowledged at his deposition that he had an altered and expired New York driver's license in his wallet on December 12, 2015, and he states as much in his opposition to Defendants' motion. (Saheed Dep. 93:4-94:2, 123:20-124:3; Ex. I; Pl. Opp. 4). Accordingly, the Officers had probable cause to issue a summons to Saheed for his altered license.

Further, the absence of record evidence concerning the reasons for the dismissal of the summons means that Plaintiff has failed to show (or even raise a triable issue of fact) "that the underlying criminal proceeding ended in a manner that affirmatively indicates his innocence." *Lanning*, 908 F.3d at 22. And finally, with respect to Plaintiff's federal (as opposed to state-law) claim for malicious prosecution, Plaintiff has failed to show a "sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman*, 215 F.3d at 215; *see id.* at 216 (finding, in motion to dismiss context, that post-arraignment conditions requiring plaintiff, *inter alia*, to "return to court on at least five occasions before the charges against him were ultimately dropped" "sufficiently demonstrated the requisite post-arraignment restraint of liberty"); *see also Burg*, 591 F.3d at 98 ("We hold that the issuance of a pre-arraignment, non-felony summons requiring a later court appearance,

without further restrictions, does not constitute a Fourth Amendment seizure. This summons does no more than require Burg to appear in court on a single occasion, and operates to effectuate due process.").

Defendants have alternatively requested summary judgment on the basis of qualified immunity. (Def. Br. 5-6, 11). "Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stephenson* v. *Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (internal quotation marks and citation omitted); *see also Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982); *Sloley* v. *VanBramer*, 945 F.3d 30, 36 (2d Cir. 2019). Rights are "clearly established" where "existing law … place[s] the constitutionality of the officer's conduct 'beyond debate.'" *Dist. of Columbia* v. *Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 741 (2011)). "In determining whether a right was so clearly established, the Supreme Court has emphasized that the 'dispositive inquiry … is whether it would be clear to a *reasonable officer* that his conduct was unlawful *in the situation he confronted.*'" *Barboza* v. *D'Agata*, 676 F. App'x 9, 12 (2d Cir. 2017) (summary order) (quoting *Saucier* v. *Katz*, 533 U.S. 194, 202 (2001)); *see generally Francis* v. *Fiacco*, 942 F.3d 126, 145-46 (2d Cir. 2019) ("The Supreme Court has lately emphasized the breadth of qualified immunity protection." (collecting cases)). Qualified immunity protects officers when "their decision was reasonable, even if mistaken"; indeed, it "protect[s] all but the plainly incompetent or those who knowingly violate the law." *Johnson*

v. *Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (quoting *Hunter* v. *Bryant*, 502 U.S. 224, 229 (1991)).

"In the context of § 1983 actions predicated on allegations of false arrest, … an arresting officer is entitled to qualified immunity so long as 'arguable probable cause' was present when the arrest was made." *Figueroa* v. *Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (quoting *Zalaski* v. *City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013)); *see also Betts* v. *Shearman*, 751 F.3d 78, 82-83 (2d Cir. 2014) (holding that a police officer is entitled to qualified immunity in the context of a false arrest claim if there was at least "arguable probable cause" at the time the officer arrested the plaintiff, and a police officer likewise is entitled to qualified immunity on a malicious prosecution claim if there was "arguable probable cause" at the time the criminal proceeding commenced and continued). Arguable probable cause exists when an officer demonstrates that "[i] it was objectively reasonable for the officer to believe that probable cause existed, or [ii] officers of reasonable competence could disagree on whether the probable cause test was met." *Garcia* v. *Does*, 779 F.3d 84, 92 (2d Cir. 2015) (internal quotation marks and citations omitted). "[W]hether an officer's conduct was objectively reasonable" depends on "the information possessed by the officer at the time of the arrest," not "the subjective intent, motives, or beliefs of the officer." *Id.* (quoting *Amore* v. *Novarro*, 624 F.3d 522, 536 (2d Cir. 2010)). "[I]n situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity." *Caldarola* v. *Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002).

While the Court finds that Defendants have established probable cause to arrest and to prosecute Saheed, the record also certainly satisfies the lower, "arguable probable cause" standard. Accordingly, Saheed's false arrest and malicious prosecution claims, brought under both § 1983 and state law, are dismissed.

### 2. The Court Grants Defendants' Motion for Summary Judgment as to Saheed's Claims for Denial of His Right to a Fair Trial

#### a. Applicable Law

"To prevail on a denial of a fair trial claim, a plaintiff must show that 'an [i] investigating official [ii] fabricates evidence [iii] that is likely to influence a jury's decision, [iv] forwards that information to prosecutors, and [v] the plaintiff suffers a deprivation of liberty as a result.'" *Soomro* v. *City of New York*, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016) (quoting *Jovanovic* v. *City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order)); *see also Ricciuti* v. *N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997) ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."); *accord Bellamy* v. *City of New York*, 914 F.3d 727, 745 (2d Cir. 2019); *Garnett* v. *Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016).

"Courts addressing claims of fabrication of evidence have emphasized that plaintiffs must plead a causal link between the deprivation of liberty and the use of fabricated evidence — 'a familiar concept in tort law, requiring both

factual and proximate causation[.]'" *Rodriguez* v. *Derienzo*, No. 20 Civ. 87 (CM), 2020 WL 615052, at *3 (S.D.N.Y. Feb. 7, 2020) (internal citation omitted) (collecting cases); *see also Ganek* v. *Leibowitz*, 874 F.3d 73, 91 (2d Cir. 2017) (finding that plaintiff could not state a claim for a liberty deprivation attributable to an arrest supported by probable cause unless "the fabricated evidence causes some 'further deprivation'" (quoting *Garnett*, 838 F.3d at 277)).

### b.    Analysis

It is not clear from the Complaint what evidence Saheed claims was fabricated. (*See generally* Compl.). However, at the pre-motion conference before this Court on July 29, 2019, Saheed clarified that the purportedly fabricated evidence included the Officers' statements: (i) telling "the court" that Saheed had not been arrested; (ii) that Kenny was not wearing a white shirt during Saheed's arrest (to which Kenny testified during his deposition); (iii) that Saheed's car was pulled over; (iv) that Saheed had been told he smelled like he had been drinking; (v) that Saheed did not have his seatbelt on; (vi) that Saheed refused medical attention and "discharged" himself; (vii) that Saheed's car windows were tinted; and (viii) that Saheed did not provide his driver's license, registration, and insurance. (*See* Dkt. #51 at 39-45).

Defendants ask the Court to grant summary judgment in their favor on Saheed's fair trial claim. In his opposition submission, Saheed does not

address this claim.[12]  Considering it on the merits, the Court concludes that Defendants are entitled to summary judgment in their favor.

Saheed's alleged fabrications (ii) and (iv)-(vi), even if actual fabrications, were not forwarded to prosecutors, a necessary prerequisite to a denial of fair trial claim.  While the Officers did state in their deposition testimony that they noticed the odor of alcohol, that information was not forwarded to the prosecutor or the court because the Officers did not believe Saheed to be impaired, nor were any tickets issued related to his odor.  (*See* Ex. C, D, E, G). The Officers also did not forward to the prosecutor or the court their belief regarding whether or not Saheed was wearing his seatbelt, and no summons was issued related to that.  (*See id.*).  Further, neither information about the color of Kenny's shirt nor information about whether Saheed sought medical treatment was forwarded to the prosecutor, nor would that information have impacted the issuance of the summonses or the prosecutions thereon.

Perhaps more importantly, on the current record, there is no dispute of material fact concerning whether the remaining alleged fabrications (iii) and (viii) are indeed fabrications.  All of the evidence, including documents written

---

[12]     *Cf. Jackson* v. *Fed. Exp.*, 766 F.3d 189, 197-98 (2d Cir. 2014):

> Where a partial response to a motion is made — *i.e.*, referencing some claims or defenses but not others — a distinction between *pro se* and counseled responses is appropriate.  In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate.  In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.

contemporaneously with the December 12, 2015 incident, indicates that Saheed was stopped in his car at a checkpoint and that Saheed did not provide his driver's license to the Officers. (*See* Ex. C; ALJ Hg. Tr.; Ex. O; Kenny Dep.; Nakelski Dep.; Wu Dep.). And Saheed's own allegations support this narrative. (*See* Compl. ¶ 12 ("On December 12, 2015, beginning at approximately 3:00 a.m., plaintiff was lawfully operating a motor vehicle when he was pulled over … by defendant NYPD Officers William Nakelski and Ou Qu, and Lieutenant Kevin Kenny."); *id.* at ¶ 14 ("Mr. Saheed was thereafter imprisoned in a police vehicle, transported to the 47th Police Precinct by defendant William Nakelski, and imprisoned therein.")).

Saheed's remaining two allegations concern the Officers' statements (i) to "the court" that Saheed had not been arrested and (vii) that Saheed's car windows were tinted. It is not entirely clear to the Court what statement Saheed is referring to when he claims the Officers said he was not arrested. The only potential statement to which Saheed could be referring is Kenny's statement during his deposition, on being questioned whether Saheed was "arrested," that Saheed had been "issued a summons in lieu of an arrest." (Kenny Dep. 144:22-23). The Court understands Kenny to be explaining that, instead of having Saheed charged in a criminal complaint, he was issued summonses. Regardless of the truthfulness of Kenny's testimony, it does not help Saheed's claim for denial of the right to a fair trial, because it was made in a deposition in the instant (civil) case, and was not forwarded to any prosecutor. Indeed, the transcript from Saheed's DMV hearing indicates that

Wu explicitly told the ALJ that Saheed had been arrested. (*See* ALJ Hg. Tr. 2:17-3:4:10).

Finally, Saheed's claim that the Officers stated that his car windows were tinted does not establish a claim for the denial of the right to a fair trial. The Court has already established that Officer Wu had probable cause to issue the summonses for Saheed's window tints. *See supra* note 11. While the ALJ dismissed those summonses, there is nothing in the record to establish that any the evidence presented to the ALJ was fabricated.

Accordingly, Defendants' motion for summary judgment is granted as to Saheed's claim for the denial of the right to a fair trial.

### 3. The Court Denies Defendants' Motion for Summary Judgment as to Saheed's Claims for Excessive Force, Assault, and Battery with Respect to Nakelski

#### a. Applicable Law

"Federal excessive force claims and state law assault and battery claims against police officers are nearly identical." *Graham* v. *City of New York*, 928 F. Supp. 2d 610, 624 (E.D.N.Y. 2013) (citing *Humphrey* v. *Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (summary order)); *Lloyd* v. *City of New York*, No. 14 Civ. 9968 (GHW), 2017 WL 1207838, at *19 (S.D.N.Y. Mar. 31, 2017) ("[W]ith the exception of the state actor requirement, the elements of a Section 1983 excessive force claim and state law assault and battery claims are substantially identical.").[13]

---

[13]    Under New York law, "[a]n assault is 'an intentional placing of another person in fear of imminent harmful or offensive contact'; a battery is 'intentional wrongful physical

"All claims that law enforcement officers have used excessive force … in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Lennon* v. *Miller*, 66 F.3d 416, 425 (2d Cir. 1995) (quoting *Graham* v. *Conner*, 490 U.S. 386, 395 (1989)). A use of force violates the Fourth Amendment if the police officer's conduct is "objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Cruz* v. *City of New York*, No. 15 Civ. 2265 (PAE), 2017 WL 544588, at *7 (S.D.N.Y. Feb. 8, 2017) (quoting *Maxwell* v. *City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (internal quotation omitted)).

The Supreme Court has recognized that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Ascertaining whether that use of force was reasonable "requires careful attention to the facts and circumstances of each particular case, including [i] the severity of the crime at issue, [ii] whether the suspect poses an immediate threat to the safety of the officers or others, and [iii] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* The analysis involves "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the

---

contact with another person without consent.'" *Sulkowska* v. *City of New York,* 129 F. Supp. 2d 274, 294 (S.D.N.Y. 2001) (quoting *Lederman* v. *Adams,* 45 F. Supp. 2d 259, 268 (S.D.N.Y. 1999)). "A lawful arrest is not an assault or battery under New York law, provided the force used is reasonable." *Figueroa* v. *Mazza*, 825 F.3d 89, 105 n.13 (2d Cir. 2016) (emphasis added) (citation omitted).

countervailing government interests at stake." *Figueroa*, 825 F.3d at 105

(quoting *Graham*, 490 U.S. at 396 (internal quotation marks omitted)).

Last year, in *Cugini* v. *City of New York*, 941 F.3d 604 (2d Cir. 2019), the

Second Circuit addressed the specific issue of excessive force claims involving

handcuffs.  The Second Circuit noted that many district courts in this Circuit

had adopted the analysis first set forth in *Esmont* v. *City of New York*, 371 F.

Supp. 2d 202 (E.D.N.Y. 2005), by which courts would evaluate the

reasonableness of handcuffing in a given case by considering whether "[i] the

[arrestee's] handcuffs were unreasonably tight; [ii] the defendants ignored the

arrestee's pleas that the handcuffs were too tight; and [iii] the degree of injury

to the [arrestee's] wrists."  *Cugini*, 941 F.3d at 612 (quoting *Esmont*, 371 F.

Supp. 2d at 215).  While acknowledging the utility of that analysis, the Second

Circuit eschewed a bright-line rule or "factual checklist," admonishing courts

instead to "be guided by a 'careful balanc[e]' between the 'nature and quality of

the intrusion" and the "countervailing government interests at stake' under the

circumstances."  *Id.* at 613 (quoting *Graham*, 490 U.S. at 396).  The *Cugini*

Court offered the following guidance to district courts:

> Thus a plaintiff asserting a claim for excessive force
> need not always establish that she alerted an officer to
> the fact that her handcuffs were too tight or causing
> pain.  The question is more broadly whether an officer
> reasonably should have known during handcuffing that
> his use of force was excessive.  A plaintiff satisfies this
> requirement if either the unreasonableness of the force
> used was apparent under the circumstances, or the
> plaintiff signaled her distress, verbally or otherwise,
> such that a reasonable officer would have been aware
> of her pain, or both.  *See Stainback* v. *Dixon*, 569 F.3d

767, 772 (7th Cir. 2009) ("[I]n some cases, the fact that an act will cause pain or injury will be clear from the nature of the act itself."); *Cortez* v. *McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (*en banc*) (noting that the plaintiff must allege that "an officer ignored [her] timely complaints (*or was otherwise made aware*) that the handcuffs were too tight") (emphasis added); *Liiv* v. *City of Coeur D'Alene*, 130 F. App'x 848, 852 (9th Cir. 2005) (recognizing excessive force claims may arise where "plaintiffs *either* suffered damage to their wrists as a consequence of the handcuffs *or* the plaintiffs complained to the officers about the handcuffs being too tight") (emphasis added). And, as with all aspects of a Fourth Amendment inquiry, an officer's awareness is "judged from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396, 109 S. Ct. 1865 (citation omitted).

We conclude that where an officer's use of force in handcuffing is plainly unreasonable under the circumstances or where a plaintiff manifests clear signs of her distress — verbally or otherwise — a fact finder may decide that the officer reasonably should have known that his use of force was excessive for purposes of establishing a Fourth Amendment violation.

*Id.*[14]

### b.    Analysis

The summary judgment record discloses a genuine dispute of material fact with respect to whether Nakelski handcuffed Saheed too tightly, and whether Saheed suffered an injury sufficient to sustain an excessive force

---

[14]    In *Cugini*, the Second Circuit concluded that "a reasonable jury could find that the defendant's actions were objectively unreasonable under the circumstances and that Cugini has therefore established a Fourth Amendment violation for present purposes." *Cugini* v. *City of New York*, 941 F.3d 604, 615 (2d Cir. 2019). However, it affirmed the district court's grant of summary judgment on the alternate basis of qualified immunity, reasoning that at the time of the plaintiff's arrest, there was no "clearly established law [that] required an officer to respond to a complaint by a person under arrest where, as here, that person exhibited only non-verbal aural and physical manifestations of her discomfort." *Id.* at 616-17.

claim. Saheed contends that when Nakelski handcuffed him, he used "short black handcuffs" that are not the ones issued by the NYPD. (Saheed Dep. 105:15-24, 106:4-9). He further claims that when he was handcuffed, the cuffs were twisted, which made it very uncomfortable on his wrist and bones. (*Id.* at 105:18-24). It is not clear from the record whether Saheed explicitly told the Officers that he was in pain due to the handcuffs. However, Saheed claims that he asked for medical attention both at the site of his arrest and once he was back at the Precinct, and that on both occasions medical attention was denied to him. (*See id.* at 114:3-23, 120:2-21). Based on this record, the Court concludes that a reasonable jury could find that the manner in which Nakelski handcuffed Saheed was unreasonable under the circumstances. While the force may not have been apparent to Nakelski, Saheed's testimony establishes that he sufficiently signaled his distress to the Officers such that a reasonable officer would have been aware of Saheed's pain.

Further, on the record before the Court, it cannot conclude that the injuries Saheed sustained from the handcuffs were *de minimis. Cf. Lynch ex rel. Lynch* v. *City of Mount Vernon*, 567 F. Supp. 2d 459, 468-69 (S.D.N.Y. 2008). The documentary evidence substantiates Saheed's claim that he sustained an injury to his right wrist from the handcuffs. Both the Ambulance Records and Emergency Room Records indicate that Saheed complained about pain to his wrist. (*See generally* Ambulance Records; Emergency Room Records). And Saheed was still complaining about the pain seventeen days later, during his visit to Dr. Hochster. (*See* Ex. L). The injury was such that

34

Dr. Hochster ordered Saheed to get x-rays taken and prescribed Saheed ibuprofen to deal with the continued pain. (*See id.*; Saheed Dep. 142:2-4). Given the record, a reasonable jury could conclude that Saheed's handcuffing caused more than just temporary discomfort. *Cf. Mittelman* v. *Cty. of Rockland*, No. 07 Civ. 6382 (CM) (LMS), 2013 WL 1248623, at *13 (S.D.N.Y. Mar. 26, 2013) ("[T]here is consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort.").

As the record substantiates Saheed claim of injuries to his wrist, the Court denies Defendants' summary judgment motion on Saheed's federal claim of excessive force and state-law claims for assault and battery with respect to Nakelski. And because the right to be free from the use of excessive force was also clearly established at the time of Saheed's arrest, the Court must also deny Nakelski's claim for qualified immunity.

Accordingly, Saheed's federal claim for excessive force and his state-law claims for assault and battery will proceed to trial against Nakelski only. As the record does not contain any facts from which Saheed could establish that he was injured from any force applied by Wu or Kenny, the Court grants those Defendants' motion for summary judgment regarding these claims.

### 4. The Court Denies Defendants' Motion for Summary Judgment as to Saheed's Claim for Failure to Intervene with Respect to Wu and Kenny

#### a. Applicable Law

Law enforcement officers have an affirmative duty to intervene to prevent their fellow officers from infringing on a citizen's constitutional rights. *Rodriguez* v. *City of New York*, 291 F. Supp. 3d 396, 417 (S.D.N.Y. 2018); *see also Sloley*, 945 F.3d at 46-47. An officer can be liable under § 1983 where "[i] the officer had a realistic opportunity to intervene and prevent the harm; [ii] a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and [iii] the officer does not take reasonable steps to intervene." *Guerrero* v. *City of New York*, No. 16 Civ. 516 (JPO), 2017 WL 2271467, at *3 (S.D.N.Y. May 23, 2017). "Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" *Terebesi* v. *Torreso*, 764 F.3d 217, 244 (2d Cir. 2014) (quoting *Anderson* v. *Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "Liability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality." *Figueroa*, 825 F.3d at 106 (quoting *O'Neill* v. *Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988)). "In each case, the question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other

considerations." *Figueroa*, 825 F.3d at 107. "Failure-to-intervene claims can arise out of a limitless variety of factual scenarios." *Id.*

It is well established that a plaintiff may not state a claim for failure to intervene against an officer who directly participated in the allegedly unlawful conduct. *See Case* v. *City of New York*, 233 F. Supp. 3d 372, 402 (S.D.N.Y. 2017) ("[A] defendant 'cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop [himself] from committing that violation.'" (quoting *Marom* v. *City of New York,* No. 15 Civ. 2017 (PKC), 2016 WL 916424, at *19 (S.D.N.Y. Mar. 7, 2016))); *Sanabria* v. *Detective Shawn Tezlof*, No. 11 Civ. 6578 (NSR), 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016).

### b. Analysis

As explained above, Saheed has established a genuine dispute of material fact with respect to whether he was subjected to excessive force by Nakelski in violation of his constitutional rights and New York State law. The Court finds that Saheed has also established a genuine dispute of material fact with respect to his failure to intervene claims against Wu and Kenny on the same point. Saheed's arrest was effected by all of the Officers at the checkpoint. While Nakelski is the officer who allegedly handcuffed Saheed in an injurious manner, Wu and Kenny were present at the arrest; they saw how Nakelski handled Saheed; and they did nothing to stop it. *See Figueroa*, 825 F.3d at 108 (concluding that plaintiff had established a failure to intervene claim where defendant officers sat passively during a twenty-second assault).

Further, and importantly, Saheed claims that he made his requests for medical attention known to both Wu and Kenny, but that neither of them responded to his request.

Accordingly, to the extent that Saheed's claim for failure to intervene, brought under § 1983, is predicated on Wu's and Kenny's respective failures to intervene to prevent the excessive force, that claim survives summary judgment. To the extent it is predicated on anything else, summary judgment is granted in favor of Defendants. *See Wieder* v. *City of New York*, No. 09 Civ. 3914 (WFK), 2013 WL 1810751, at *13 (E.D.N.Y. Apr. 29, 2013) (granting defendants' summary judgment on plaintiff's failure to intervene claim where court dismissed plaintiff's false arrest and malicious prosecution claims). The failure to intervene claim against Nakelski is also dismissed, since he is the defendant who is alleged to have committed the underlying excessive force violation.

### 5. The Court Grants Defendants' Motion for Summary Judgment as to Saheed's Supervisory Liability Claim

"[T]o establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon* v. *City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (collecting cases). "[S]upervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." *Meriwether* v. *Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989) (quoting *McCann* v. *Coughlin*, 698 F.2d 112, 125 (2d Cir. 1983)). For purposes

of establishing deliberate indifference, "[t]he operative inquiry is whether the facts suggest that the [supervisor's] inaction was the result of a 'conscious choice' rather than mere negligence." *Amnesty Am.* v. *Town of West Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) (quoting *City of Canton, Ohio* v. *Harris*, 489 U.S. 378, 389 (1989)). As to gross, rather than mere, negligence, that standard "is satisfied where the plaintiff establishes that the defendant-supervisor was aware of a subordinate's prior substantial misconduct but failed to take appropriate action to prevent future similar misconduct before the plaintiff was eventually injured." *Raspardo* v. *Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (citing *Johnson* v. *Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 255 (2d Cir. 2001)).

To establish liability, a plaintiff must also show "that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Raspardo*, 770 F.3d at 116 (citation omitted). "A defendant's supervisory authority is insufficient in itself to demonstrate liability under § 1983." *LaMagna* v. *Brown*, 474 F. App'x 788, 789 (2d Cir. 2012) (summary order) (citing *Richardson* v. *Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." (citations and internal quotation marks omitted))).

Here, Saheed has failed to show that Kenny can be held liable under a supervisory liability theory. While the record reflects that Kenny was at the scene of Saheed's arrest, when Nakelski allegedly used excessive force in

handcuffing Saheed, Saheed provides the Court with no facts to substantiate a claim of Kenny's gross negligence or deliberate indifference. Further, and importantly, the record contains no facts supporting the claim that Kenny was the proximate cause of Saheed's constitutional deprivation. Accordingly, Defendants' motion for summary judgment as to Saheed's claim of supervisory liability is granted.

6. **The Court Grants Defendants' Motion for Summary Judgment as to Saheed's Remaining State-Law Claims**

To the extent Saheed has brought general negligence claims, such claims fail as a matter of law. Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or in initiating a prosecution. *Bernard* v. *United States*, 25 F.3d 98, 102 (2d Cir. 1994). Thus, Defendants are entitled to summary judgment on Saheed's various negligence claims.

Saheed's final claim is that his rights were violated in contravention of Article 1, § 12 of the New York State Constitution. In *Brown* v. *New York*, 89 N.Y.2d 172 (1996), the New York Court of Appeals recognized the availability of damages actions against for violations of the State's search and seizure protections. However, *Brown's* application has been limited by both district and state courts to situation where plaintiffs have no alternative remedies to protect their interests. *See Sullivan* v. *City of New York*, No. 17 Civ. 3779 (KPF), 2018 WL 3368706, at *20 (S.D.N.Y. July 10, 2018) ("Courts have consistently held that where a plaintiff has asserted a viable Fourth Amendment claim

40

under Section 1983 any violation of the plaintiff's [New York State Constitution Article 1, § 12] right to be free of unreasonable searches and seizures can be vindicated through this claim." (internal quotations and alterations omitted)); *Vilkhu* v. *City of New York*, No. 06 Civ. 2095 (CPS) (JO), 2008 WL 1991099, at *8 (E.D.N.Y. May 5, 2008) (citing cases).  Here, because Saheed has a valid Fourth Amendment claim for excessive force against Nakelski, and a failure to intervene claim against Wu and Kenny, his claims for the same conduct under Article 1, § 12 of the New York State Constitution are dismissed.

Any other claims Saheed raises under the New York State Constitution are dismissed for the same reasons that they failed to satisfy the Court's earlier Fourth Amendment analyses.  *See Mittelman*, 2013 WL 1248623, at *30 ("The search and seizure language of the Fourth Amendment of the United States Constitution and the language of Article 1, Section 12 of the New York State Constitution [entitled 'Security against unreasonable searches, seizures and interceptions'] is identical, and the two provisions generally confer similar rights." (quoting *People* v. *Harris*, 77 N.Y.2d 434, 437 (1991)).

### 7. The Court Grants Defendants' Motion for Summary Judgment as to Saheed's Municipal Liability Claim

Municipal entities may be sued directly for constitutional violations pursuant to § 1983.  *See Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *accord Vasallo* v. *City of New York,* No. 15 Civ. 7125 (KPF), 2016 WL 6902478, at *12 (S.D.N.Y. Nov. 22, 2016).  A plaintiff may establish municipal liability under *Monell* in several ways, including by presenting evidence of "[i] an express policy or custom, [ii] an authorization of a policymaker of the

unconstitutional practice, [iii] failure of the municipality to train its employees, which exhibits a 'deliberate indifference' to the rights of its citizens, or [iv] a practice of the municipal employees that is 'so permanent and well settled as to imply the constructive acquiescence of senior policymaking officials.'" *Biswas* v. *City of New York*, 973 F. Supp. 2d 504, 536 (S.D.N.Y. 2013) (quoting *Pangburn* v. *Culbertson*, 200 F.3d 65, 71-72 (2d Cir. 1999)). Defendants are entitled to summary judgment on Saheed's claim for municipal liability as he has not even attempted to establish a genuine dispute of material fact with respect to any of the elements of such claim. Saheed has presented evidence of neither policy nor systemic practice within the NYPD.

## CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Saheed's § 1983 claim for excessive force, and his state-law assault and battery claims, will proceed to trial against Defendant Nakelski. Saheed's § 1983 claim for failure to intervene will proceed to trial against Defendants Wu and Kenny.

Further, since all claims have been dismissed against the City of New York, the Clerk of Court is directed to terminate the case as to that Defendant.

Defendants are hereby ORDERED to re-file, on the public docket, Exhibits P, Q, R, and S as the full transcripts from the depositions of Saheed, Kenny, Nakelski, and Wu, respectively, within fourteen days of the date of this Opinion and Order.

The remaining parties are hereby ORDERED to appear for a pretrial conference on **May 5, 2020, at 11:30 a.m.**  The Court will issue an order at a later time informing the parties whether the conference will take place at the Courthouse or will be telephonic.

SO ORDERED.

Dated:     April 2, 2020
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

*Sent by First Class Mail to:*
Hafeez Saheed
973 E. 221st Street
Bronx, NY 10469
347/376-5233